UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Kesseböhmer Retail Merchandising USA, Inc. | |
| *Plaintiff*, | No. 24 CV 1172 |
| v. | Judge Lindsay C. Jenkins |
| Pete's Fresh Market 4700 Corp., D/B/A Pete's Market, | |
| *Defendant*. | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Kesseböhmer Retail Merchandising USA, Inc., ("Kesseböhmer") sued Defendant Pete's Fresh Market ("PFM") after the grocery store chain refused to accept or pay for nearly $850,000 worth of shelves Kesseböhmer manufactured for its stores. Kesseböhmer alleges the parties had a valid, albeit unwritten, contract for the goods, which it has been unable to sell to another customer given the shelves' unique specifications.

Before the Court is PFM's motion to dismiss the complaint in its entirety. PFM argues the Uniform Commercial Code's statute of frauds (as adopted by Illinois) precludes a finding that any enforceable contract exists in this case. Alternatively, PFM contends Kesseböhmer's claims for implied-in-fact contract, oral contract, and promissory estoppel fail on the merits. Kesseböhmer concedes the statute of fraud governs, but insists exceptions to the rule apply to its otherwise well-pleaded claims. The Court agrees with Kesseböhmer, and largely denies the motion.

1

I.  **Background**

The Court takes Plaintiffs' well-pleaded factual allegations as true for purposes of ruling on the motion to dismiss. *See Smith v. First Hosp. Lab'ys, Inc.*, 77 F.4th 603, 607 (7th Cir. 2023). Kesseböhmer designs and manufactures shelving and other types of displays for retail businesses. [Dkt. 1 ¶ 3.] One of its clients is PFM, an Illinois-based grocery store chain. [*Id.* ¶ 4.]

In April 2022, Kesseböhmer sales representative Brad Legan began negotiating with PFM's owner, James Dremonas, and his nephew, Petro Dremonas, to install shelves at PFM's "Kedzie" and "Orland Park" locations.[1] After several meetings and follow-up communications between the parties regarding the scope of the projects, Legan sent Petro an email on July 27, 2022, quoting the cost at $456,807 for Kedzie and $379,990 for Orland Park. Legan's email also noted it would be able to accommodate PFM's request to have the shelves ready for delivery by the end of 2022. [*Id.* ¶¶ 5-12.]

The parties continued to negotiate and modify aspects of Kesseböhmer's quote. On August 12 and 16, 2022, Legan sent new quotes to Petro with reduced costs for the Kedzie location, and the parties agreed to meet in Chicago on August 23, 2022, to finalize the projects. According to Kesseböhmer, the parties agreed at the meeting to proceed at the initially quoted price for the Orland Park location, and a new price of $375,000 for the Kedzie location. [*Id.* ¶¶ 16-19.]

---

[1]  The Kedzie store is located at 3250 W. 87th Street, Chicago, IL 60652, and the Orland Park store's location is 15080 S. LaGrange Rd., Orland Park, IL 60462.

A week later, Petro requested additional modifications and another meeting "to get this finalized." The meeting occurred at PFM's headquarters in Chicago on September 1, 2022. Both Petro and James attended, as well as Legan and two other senior Kesseböhmer employees. Kesseböhmer avers the parties reached final, verbal agreements during the meeting on cost and specifications for both the Kedzie and Orland Park projects. Legan believed PFM "would honor the terms of the instant verbal order" because he had previously executed a shelving sale with PFM without a formal written contract. Based on the agreement reached at this meeting, Kesseböhmer began fulfilling the order. [*Id.* ¶¶ 20, 23-32.]

The shelving PFM ordered was unique in a few ways. First, PFM requested "European style" fixtures, which constitutes less than 15% of the U.S. market according to Kesseböhmer's estimates. In addition, PFM's shelving was taller than normal, used a different blackboard material, and had colors and spray treatments Kesseböhmer had never used before. PFM's order also required Kesseböhmer to develop a custom "bespoke 'U-Channel' system … to accept the specific wood paneling backboards" PFM wanted. To execute this design, Kesseböhmer employed special welding. Kesseböhmer asserts it would need to make changes to these unique features to sell the shelves to another customer. [*Id.* ¶¶ 33-42.]

After the September 1 meeting through the end of 2022, Legan and PFM regularly communicated with one another about the projects. On September 28, 2022, Legan asked Petro when he wanted to install the shelves at the Kedzie location. Petro responded that mid-February 2023 was most likely given flooring issues PFM

3

recently discovered at the store. On October 10, 2022, Legan and Petro met to discuss the projects, and according to Legan, PFM confirmed the terms of the September 1 agreement. However, PFM did not provide a purchase order despite Kesseböhmer's request. Just over a week later, PFM sent Kesseböhmer slight revisions to its order based on an altered floorplan, which Kesseböhmer accommodated. Based on these changes, Legan replaced the sample shelving for the projects at PFM prior to a November 1, 2022, meeting. [*Id.* ¶¶ 43-50, 52-54.]

Kesseböhmer had materially completed manufacturing PFM's shelves by the end of 2022. On December 16, 2022, Petro reached out to Legan informing him that PFM wanted Kesseböhmer to begin working on a quote for another project for a different store, which Legan agreed to provide. Legan also told Petro he saw the finished product in Kesseböhmer's warehouse for the Kedzie and Orland Park projects and it "looks great."

Legan then met with James on December 27, 2022, to discuss the projects. Legan summarized the meeting to Petro in an email two days later. He noted Kesseböhmer had the shelving ready, but flooring problems at the Kedzie location made the final delivery date "TBD." The email also alerted Petro that they "should review the Orland Park, IL project when that layout gets close to final to confirm we have enough excess fixture inventory to cover both projects." [*Id.* ¶¶ 55-61.]

Seemingly because of the Kedzie location's flooring problems, PFM inquired as to whether Kesseböhmer would be able to redirect some of the shelving for Kedzie to

another PFM location on 47th street.[2] Legan provided Petro with a quote for the 47th street location, noting PFM had various options based on what it wanted to install. The parties met throughout January 2023 on where to allocate shelving. [*Id.* ¶ 62.]

On February 1, 2023, Legan reached out to Petro for anticipated delivery dates for the 47th street, Kedzie, and Orland Park locations. Legan reminded Petro the initial timeline for these projects was the end of 2022, and Kesseböhmer was holding the inventory at its warehouse. Legan also asked to speak with Petro about partial payment for the projects given James's latest anticipated delivery date of summer 2023. [*Id.* ¶ 63.]

Petro responded several weeks later, asking Legan to compare its quote for the 47th street location with a bid from Kesseböhmer's competitor, Storeflex. Kesseböhmer interpreted this development as a sign PFM was trying to cancel their agreement, or obtain additional concessions for the projects.[3] Kesseböhmer responded to Petro's inquiry by requesting PFM reduce the parties' September 1, 2022, agreement to writing, which PFM refused to do. [*Id.* ¶¶ 64-72.]

On April 3, 2023, Legan emailed Petro summarizing the history of the projects and the parties' agreement. Legan reminded Petro that James agreed to projects for the Kedzie and Orland Park locations in the fall of 2022 with an anticipated delivery date by the end of that year, but delivery was delayed because of PFM's internal issues. Legan again asked Petro to reduce their agreement to writing so they could

---

[2] The store's full address is 4700 S Kedzie Ave, Chicago, IL 60632.
[3] Kesseböhmer also notes the price of steel decreased between September 1, 2022, and when Storeflex issued its quote nearly six months later.

proceed with payment. Petro did not respond to this email nor a follow-up email from Legan on the same question. Ultimately, PFM did not accept any of the shelving for either the Kedzie or Orland Park locations, and it remains assembled, but undelivered in Kesseböhmer's warehouse. [*Id.* ¶¶ 74-77.]

Kesseböhmer filed this lawsuit, alleging PFM breached an implied-in-fact contract for the custom shelving. In the alternative, Kesseböhmer contends PFM breached an oral contract, or is liable based on a promissory estoppel theory. PFM has moved to dismiss.

## II. Analysis

At the motion to dismiss stage, the Court takes well-pleaded factual allegations as true and draws reasonable inferences in favor of the plaintiff. *Choice v. Kohn L. Firm, S.C.*, 77 F.4th 636, 638 (7th Cir. 2023); *Reardon v. Danley*, 74 F.4th 825, 826-27 (7th Cir. 2023). "To survive a motion to dismiss under Rule 12(b)(6), plaintiff's complaint must allege facts which, when taken as true, plausibly suggest that the plaintiff has a right to relief, raising that possibility above a speculative level." *Cochran v. Ill. State Toll Highway Auth.*, 828 F.3d 597, 599 (7th Cir. 2016) (cleaned up). A plaintiff's claim must be "plausible, rather than merely speculative," which requires a plaintiff to allege "just enough details about the subject matter of the case to present a story that holds together." *Russell v. Zimmer, Inc.*, 82 F.4th 564, 570-71 (7th Cir. 2023) (cleaned up).

PFM's motion to dismiss raises two main arguments. First, Illinois's statute of frauds precludes Kesseböhmer from proceeding on any of its claims because there is

no written contract, and no exceptions apply. [Dkt. 11 at 4-9.][4] Second, even if Kesseböhmer can satisfy the statute of frauds, Kesseböhmer's claims fail on the merits as it has not alleged any form of contract existed between the parties. [*Id.* at 9-14.]

A.   **Illinois's Statute of Frauds**

Illinois has codified the UCC's statute of frauds, which provides "a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties." 810 ILCS 5/2-201(1). Kesseböhmer concedes this provision governs its agreement with PFM, and that the parties do not have a written contract. [Dkt. 15 at 9.] Instead, Kesseböhmer contends two exceptions to the statute of frauds apply: the "between merchants" exception, and the "specially manufactured" exception. The Court need only analyze the latter to resolve the motion.

The specially manufactured exception to the statute of frauds requires several conditions to be met. First, the parties must have an enforceable contract that, while not in writing, "is valid in other respects." 810 ILCS 5/2-201(3). An implied-in-fact or oral contract suffices. 810 ILCS 5/2-204. If the parties have such a contract, then the exception applies "if the goods are to be specially manufactured for the buyer and are not suitable for sale to others in the ordinary course of the seller's business and the seller, before notice of repudiation is received and under circumstances which reasonably indicate that the goods are for the buyer, has made either a substantial

---

[4]   Citations to docket filings generally refer to the electronic pagination provided by CM/ECF, which may not be consistent with page numbers in the underlying documents.

beginning of their manufacture or commitments for their procurement." 810 ILCS 5/2-201(3)(a). Put simply, the Court must determine whether Kesseböhmer has adequately alleged the existence of a non-written contract, and if so, whether Kesseböhmer manufactured unique shelving for PFM before PFM cancelled the sale.

### i. Existence of Non-Written Contract

For a valid and enforceable contract to exist under Illinois law, there must be an offer, acceptance of the offer, consideration, and mutual assent. *Wilda v. JLG Industries, Inc.*, 470 F.Supp.3d 770, 798 (N.D. Ill. 2020) (citing *Nat'l Prod. Workers Union Ins. Trust v. Cigna Corp.*, 665 F.3d 897, 901 (7th Cir. 2011)). The existence of acceptance and mutual assent—whether the parties have a "meeting of the minds"— is based on the parties' objective conduct; "subjective intentions are irrelevant." *Nat'l Prod. Workers*, 665 F.3d 897 at 901; *see also Acad. Chicago Publishers v. Cheever*, 578 N.E.2d 981, 984 (Ill. 1991); *Trapani Const. Co. v. Elliot Grp., Inc.*, 2016 IL App (1st) 143734, ¶ 43. The question of whether a contract exists "is usually one for the factfinder." *Nat'l Prod. Workers*, 665 F.3d 897 at 902; *Ins. Ben. Grp., Inc. v. Guar. Trust Life Ins. Co.*, 2017 IL App (1st) 162808, ¶ 46 (whether an oral contract exists, the terms of the contract, and the parties' intent are "questions of fact.")

Kesseböhmer's argues the parties had an implied-in-fact contract. [Dkt. 1 at 23-24.] "An implied-in-fact contract is a true contract, containing all necessary elements of a binding agreement; it differs from other contracts only in that it has not been committed to writing or stated orally in express terms, but rather is inferred from the conduct of the parties in the milieu in which they dealt." *Control Solutions LLC v. Oshkosh Corp.*, 2012 WL 3096678, at *7 (N.D. Ill. July 27, 2012) (quoting *AEI*

8

*Music Network, Inc. v. Business Computers, Inc.*, 290 F.3d 952, 956 (7th Cir. 2002)). In an implied-in-fact contract, "a contractual duty is imposed by a promissory expression which may be inferred from the facts and circumstances and the expressions on the part of the promisor which show an intention to be bound." *Gociman v. Loyola Univ. of Chi.*, 41 F.4th 873, 883 (7th Cir. 2022). Similarly, "acceptance of a contract implied in fact … can be proven by circumstances demonstrating that the parties intended to contract and by the general course of dealing between the parties." *Trapani Const. Co.*, 2016 IL App (1st) 143734, ¶ 43.

Kesseböhmer also contends the parties had an oral contract. [Dkt. 1 at 24-25.] An oral contract has the same requirements as a written contract. *See Kolbe v. CZS Holdings LLC*, 2021 WL 4864143, at *4 (N.D. Ill. Oct. 19, 2021) ("[t]o plead the existence of an enforceable oral contract, a plaintiff must establish offer, acceptance, consideration, and definite and certain terms"); *Ins. Ben. Grp.*, 2017 IL App (1st) 162808, ¶ 46 ("[o]ral agreements are binding so long as there is an offer, an acceptance, and a meeting of the minds as to the terms of the agreement.")

Both types of contracts are contemplated by Illinois's UCC, which instructs a "contract for sale of goods may be made in any manner sufficient to show agreement" and an "agreement sufficient to constitute a contract for sale may be found even though the moment of its making is undetermined." 810 ILCS 5/2-204(1)-(2). Moreover, "[e]ven though one or more terms are left open a contract for sale does not

9

fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy." 810 ILCS 5/2-204(3).

The Court concludes Kesseböhmer has sufficiently alleged both contractual theories.[5] From April through August 2022, Legan met with James and Petro Dremonas to refine the shelving projects at the Kedzie and Orland Park locations. On September 1, 2022, these negotiations culminated in a meeting where Kesseböhmer alleges the parties came to an oral agreement on material terms such as price and specifications for both projects. *See supra*, at 2-4.

After this September 1 meeting, Legan continued to keep PFM informed about Kesseböhmer's progress on the projects. Legan made it clear Kesseböhmer was preparing the shelves as requested, and that they would have the shelves for the Kedzie store ready by the end of 2022 (PFM's initial requested timeframe). PFM responded by asking for a later delivery date. Towards the end of 2022, Legan told Petro he had seen the finished work product and that it "looks great." In early 2023, the conversations between the parties discussed the possibility of using some of the product for the Kedzie and Orland Park locations to another PFM store. *Id.* at 4-6.

Viewed in the light most favorable to Kesseböhmer, these allegations support the finding of an oral contract. There is an offer (based on the quote as modified during the meeting, which contains pricing and specifications); an acceptance of that offer (James's verbal acceptance during the September 1 meeting); consideration (the

---

[5]  As PFM notes, "an implied contract cannot exist with an express [oral] contract on the same subject", *Marcatante v. City of Chicago*, 657 F.3d 433, 440 (7th Cir. 2011), but these claims can proceed in the alternative. *See Hernandez v. Illinois Inst. Of Tech.*, 63 F.4th 661, 671 (7th Cir. 2023).

10

shelves in exchange for money); and mutual assent (after months of negotiations, Kesseböhmer understood what precise shelves PFM wanted, and PFM understood what precise shelves it was getting). *Ins. Ben. Grp.*, 2017 IL App (1st) 162808, ¶ 46 ("[o]ral agreements are binding so long as there is an offer, an acceptance, and a meeting of the minds as to the terms of the agreement.")

PFM's argument in response is unavailing. It contends that Kesseböhmer's offer is "a series of alleged quotes, design documents, written communications, meetings and telephone calls." [Dkt. 11 at 12.] But that is not true. Kesseböhmer alleges the culmination of these materials led to an oral agreement during the September 1, 2022, meeting. PFM also argues the parties' post-September 1 communications and alterations to the projects establishes the parties did not reach an agreement. [*Id.*] The Court disagrees. A valid oral contract is not made unenforceable because the parties subsequently modify it. *McCarthy v. Ill. Cas. Co.*, 946 N.E.2d 895, 902 (Ill. App. Ct. 2011) ("parties to a contract are generally free to modify the contract by mutual assent or agreement, as long as the modification does not violate law or public policy"); 810 ILCS 5/2-209(1)(3) (modifications to contracts are permitted under the UCC without additional consideration so long as the modification complies with the statute of frauds).[6]

PFM's final argument as to why no oral contract existed is that Kesseböhmer reached out on multiple occasions after September 1 to obtain a purchase order, which

---

[6] The Court also notes the modifications to the agreement—including changes to the delivery date and specifications—were initiated by PFM. The UCC permits parties to waive formal modification requirements. 810 ILCS 5/2-209(4); *see also Midland Paper Co. v.*

11

PFM refused to issue. [Dkt. 11 at 12.] But PFM does not explain how its decision to refuse to execute a purchase order delegitimizes the parties' September 1 oral contract. PFM suggests in a footnote that the parties agreed at the September 1 meeting to reduce their contract to writing. [*Id.* n.5.] Kesseböhmer alleges, however, it agreed to perform based on the oral agreement, and only sought the purchase order after PFM signaled it needed to delay delivery, and then was going to renege on the parties' agreement. [Dkt. 1 ¶¶ 31-32, 71; Dkt. 15 at 6-7.] Kesseböhmer has alleged the existence of an oral contract.

For similar reasons, the Court also agrees Kesseböhmer has pled the existence of an implied-in-fact contract. PFM's conduct for nearly an entire year objectively signaled it agreed to purchase the shelves it designed and ordered. Kesseböhmer made it irrefutably clear to PFM that it was manufacturing the shelves based on the agreed specifications, and in time for PFM's initial requested delivery date. When Legan asked Petro when the shelves should be delivered, Petro did not object to the delivery, nor ask Kesseböhmer to stop working even though PFM knew it had flooring issues. A reasonable inference from Petro's response is the parties did have a contract, PFM knew the contents of the contract, wanted Kesseböhmer to continue performing under the contract, and that PFM itself would (belatedly) perform. *Control Solutions*

---

*Sagacity Media, Inc.*, __ F. Supp.3d __, 2024 WL 1376349, at *6 (N.D. Ill. 2024) (waiver occurs where party seeking to enforce waiver "reasonably relied on the other party's having waived" the writing). PFM can hardly argue its requested modifications to the September 1 agreement needed to be in writing.

12

*LLC*, 2012 WL 3096678, at *7 (an implied-in-fact contract "is inferred from the conduct of the parties.")

Likewise, Legan met with James at the end of 2022 once the shelves were ready for delivery. The parties discussed using some of the materials for a third store and other potential modifications because of PFM's problems, but James did not suggest the parties never had an agreement. Taken together, "the facts and circumstances and the expressions on the part of the promisor … show an intention to be bound." *Gociman*, 41 F.4th 873, at 883. As alleged in the complaint, PFM knew Kesseböhmer was manufacturing the shelves according to the precise specifications agreed on September 1, and did nothing to dissuade Kesseböhmer despite ample opportunity to do so.

    **ii.    Promissory Estoppel**

Before turning to whether the contract satisfies the specially manufactured exception, the Court addresses Kesseböhmer's promissory estoppel claim and concludes it must be dismissed. A claim for promissory estoppel requires the plaintiff to "prove that (1) defendant made an unambiguous promise to plaintiff, (2) plaintiff relied on such promise, (3) plaintiff's reliance was expected and foreseeable by defendants, and (4) plaintiff relied on the promise to its detriment." *Newton Tractor Sales, Inc. v. Kubota Tractor Corp.*, 906 N.E.2d 520, 523 (Ill. 2009).

Kesseböhmer concedes this transaction is governed by the statute of frauds, [Dkt. 15 at 9], and a claim that is barred by the statute of frauds likewise bars a claim for promissory estoppel. *Control Solutions LLC*, 2012 WL 3096678, at *11 (in "Illinois, the statute of frauds is applicable to promises claimed to be enforceable under the

13

doctrine of promissory estoppel"); *Eastek Int'l Corp. v. Ingersoll-Rand Co.*, 2010 WL 4790912, at *2 (N.D. Ill. Nov. 16, 2010) ("where the statute of frauds bars a contract claim, it also bars a promissory estoppel claim based on the same allegations.") Accordingly, Kesseböhmer cannot enforce PFM's alleged oral promises through promissory estoppel because it does not satisfy the statute of frauds.

Nor can promissory estoppel satisfy any exception to the statute of frauds. As explained above, the exceptions to the statute of frauds only apply where there is a valid contract. 810 ILCS 5/2-201(3). But promissory estoppel requires the absence of consideration, an essential element of a contract. *Carcharadon, LLC v. Ascend Robotics, LLC*, 2023 WL 3320286, at *9 (N.D. Ill. May 9, 2023) ("[p]romissory estoppel is meant for cases in which a promise, not being supported by consideration, would be unenforceable under conventional principles of contract law"); *Matthews v. Chi. Transit Auth.*, 2016 IL 117638, ¶ 92 ("promissory estoppel is proper only in the absence of an express agreement.") There is no avenue for Kesseböhmer's promissory estoppel claim to proceed and is therefore dismissed.

    iii.   **Specially Manufactured Exception**

Having determined Kesseböhmer adequately alleged enforceable oral and implied-in-fact contracts, the Court turns to the specifics of the specially manufactured exception. As noted above, a party seeking this exception must satisfy the following criteria: (1) the goods must be specially manufactured for the buyer; (2) the seller cannot resell the goods to others in the normal course of its business; and (3) the seller has made a "substantial beginning" of manufacturing the goods before the buyer repudiates. 810 ILCS 5/2-201(3)(a); *Vanguard Energy Servs. v. Shihadeh*,

2017 IL App (2d) 160909, ¶ 28. "The purpose of the specially manufactured goods exception is to prevent a supplier from being left with goods it cannot sell to anyone else." *Control Solutions LLC*, 2012 WL 3096678, at *9. The salient inquiry is whether "the manufacturer can, with slight alterations, sell the goods … if the manufacturer must make 'essential changes' to make the goods marketable to others, then the specially manufactured exception to the statute of frauds applies." *R.M. Schultz & Assocs. v. Nynex Computer Servs. Co.*, 1994 WL 124884, at *6 (N.D. Ill. Apr. 11, 1994).

The Court has little trouble concluding Kesseböhmer has adequately alleged each criterion. Kesseböhmer contends the shelves PFM ordered are unique because they are "European style" shelves that are taller than normal; use a different blackboard material; contain different colors, wood paneling, and spray treatments; employ custom welding; and use a "bespoke 'U-Channel' system." [Dkt. 1 ¶¶ 33-41.] Kesseböhmer further alleges that these custom features render the shelves "unsuitable for resale to other customers without making essential changes to their defining characteristics." [*Id.* ¶ 42.][7] Finally, it cannot be disputed Kesseböhmer "substantially beg[an]" manufacturing the shelves before PFM repudiated; Kesseböhmer had materially finished its work and was ready to deliver it by the time PFM asked it to compare its quote to Storeflex's.

The sole argument PFM makes as to why this exception does not apply is that 15% of the U.S. market uses "European style" shelves, so Kesseböhmer admits it can

---

[7] Kesseböhmer's briefing notes it has "learned of [additional] facts that would allow Kesseböhmer to further allege its unsuccessful efforts to identify another buyer." [Dkt. 15 at 3 n.1.] As noted below, the Court will ask Kesseböhmer to file an amended complaint with these additional facts.

sell to other customers. [Dkt. 11 at 9.] But the motion ignores all the other variation that makes the shelves unique as described above.

Ultimately, the Court determines Kesseböhmer properly alleged the specially manufactured exception to the statute of frauds applies, and its claim may proceed on that basis.[8]

### III. Conclusion

For the reasons stated herein, PFM's motion to dismiss is denied, except with respect to Kesseböhmer's claim for promissory estoppel, which is dismissed. Within 14 days of this order, Kesseböhmer is directed to file an amended complaint with its additional allegations regarding its inability to resell the shelves.

Enter: 24 CV 1172
Date: May 24, 2024

_____
Lindsay C. Jenkins
United States District Judge

---

[8] Because Kesseböhmer's complaint may proceed under this exception, the Court need not decide whether the "between merchants" exception applies.