**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| Kesseböhmer Retail Merchandising USA, Inc., *Plaintiff*, v. Pete's Fresh Market 4700 Corporation, *Defendant*. | No. 24 CV 1172 Judge Lindsay C. Jenkins |

**MEMORANDUM OPINION AND ORDER**

Kesseböhmer Retail Merchandising USA, Inc., filed this lawsuit against Pete's Fresh Market for breach of an implied-in-fact contract (Count One) or alternatively breach of an oral contract (Count Two). The case concerns nearly $850,000 in shelving Kesseböhmer secured for two Pete's Fresh Market stores, one at 87th and Kedzie in Chicago and one in Orland Park. Kesseböhmer moves for partial summary judgment as to its breach of implied-in-fact contact claim and as to Pete's affirmative defense that the statute of frauds and failure to mitigate bars Kesseböhmer's claims. [Dkt. 41.] Pete's also moves for summary judgment, arguing that no valid, enforceable contract exists and even if it did, the statute of frauds applies. [Dkt. 44.] Because there are genuine issues of material fact that must be decided by a jury at trial, both motions are denied.

**I. Background**

In April 2022, the parties were introduced to one another by AWG, a buying group working in the grocery industry.[1] [Dkt. 51, ¶¶ 13, 15.][2] The parties discussed a custom shelving order for two new Pete's Fresh stores, the first of which was for Pete's 87th Street location. [Dkt. 53, ¶¶ 1, 14.] Brad Legan was Kesseböhmer's primary representative on the deal and Kesseböhmer's CEO Andre Klehm was involved along the way. Pete's was primarily represented by a project manager, Petro Drimonas, as well as Pete's President, James Dremonas. [*Id.*, ¶¶ 2, 27.]

---

[1] The parties dispute the scope of AWG's intermediary role—specifically whether Kesseböhmer would have received payment from Pete's or AWG. [Dkt. 51, ¶¶ 13, 18, 19, 32; Dkt. 59, ¶ 75.] But this dispute is immaterial because, as explained below, there are genuine disputes over the threshold question of contract formation.

[2] Citations to docket filings generally refer to the electronic pagination provided by CM/ECF, which may not be consistent with page numbers in the underlying documents.

1

From April to June 2022 the parties communicated about the shelves but the details of these discussions, including the extent of Pete's knowledge of shelving, are disputed. [*Id.*, ¶¶ 11, 62.] In May 2022, Petro Drimonas texted Legan: "we will be ready to place orders. So please bring all pricing proposals spec sheets etc. with the meeting" and asked, "when are we meeting with ur team to finalize and sign off on 87th and Kedzie project?" [*Id.*, ¶ 14.] In July 2022, Kesseböhmer sent Pete's quote sheets with pricing. [*Id.*, ¶¶ 15, 17; Dkt. 51, ¶ 22.]

Key meetings about the deal took place in August 2022. Petro Drimonas asked Legan "when is the next time your team is in Chicago area so we can sit down sign off and finalize[?]"; Legan responded that he and Kesseböhmer's CEO could travel to Chicago the following week to "finalize the shelving package." [*Id.*, ¶ 24.] The parties met in person a week later on August 23, 2022, but the details of that meeting are very much disputed. [*Id.*, ¶¶ 26–28; Dkt. 51, ¶¶ 23–25.] Kesseböhmer maintains that Pete's accepted its proposal "orally and with a handshake." [Dkt. 51, ¶¶ 26, 38.] According to deposition testimony from Kesseböhmer's CEO Andre Klehm, "[Petro] Drimonas said for 350 [$350,000] you have the deal, and I said let's make 375 [$375,000], and we shook hands on that"; Legan also testified that James Dremonas "agreed to the 375 and said, let's go forward, get the two stores here by the end of the year," adding "Let's do it." [Dkt. 59, ¶ 71.] Pete's disputes these contentions. It points to Klehm's deposition testimony that at the August 23 meeting, Klehm told Petro Drimonas and James Dremonas that Klehm "needed to have something in writing as soon as possible" and that James Dremonas explained that there was not "a hundred percent understanding about their store layouts right now, and as soon as that is finished, which was only a couple days out," Pete's would get Kesseböhmer something in writing, be it a purchase order or a letter of commitment. [Dkt. 51, ¶ 35.]

The parties agree that they did not discuss precisely how or when payment would be made, but it is disputed whether "payment terms" were discussed more broadly. [*Id.*, ¶¶ 27–28.] Regardless, the parties agree that Kesseböhmer typically prefers written approval of an order via an invoice or email, though they dispute whether Kesseböhmer *requires* a writing for its contracts. [*Id.*, ¶ 34; Dkt. 57, ¶ 5.] It is undisputed that Pete's never sent a letter of commitment, purchase order, or formal request to begin production to Kesseböhmer. [Dkt. 51, ¶¶ 36–37.]

On August 24, Legan sent Petro Drimonas an email describing the meeting as a "great outcome" and asked more questions about the floorplans. [Dkt. 53, ¶ 29.] Petro Drimonas responded with a scanned printout of handwritten answers to Legan's questions. [*Id.*, ¶¶ 30–31.] Kesseböhmer knew Pete's was continuing the

2

work on its floor plans, but the parties dispute whether the agreement was sufficiently definite by this point. [Dkt. 51, ¶ 41; Dkt. 53, ¶¶ 32–34.] Kesseböhmer's CEO Klehm sent Legan an email in September, stating "we should not wait too long for the PO…We are already producing and spending money…Pete's can still say, we didn't order…So everything we are doing right now is based on trust…which is OK with me for this order…" [Dkt. 51, ¶ 42.]

About a week later, Legan texted Petro Drimonas, "[c]an we put together some documentation to get signed approvals on what we are producing? I realize these orders will still process through AWG but our Operations management is nervous that we have production scheduled but not official PO or Signature from either AWG or Pete's. I am in Florida all next week but plan on working Monday and Tuesday. Thanks." [*Id.*, ¶ 44.] Petro Drimonas responded, "Yes, let's plan on meeting next week. What is your schedule so we can at least sign off on 87th and Kedzie." [*Id.*] It is disputed whether anyone from Kesseböhmer ever told Pete's that production on the shelves had already begun. [*Id.*, ¶¶ 45–46; Dkt. 53, ¶ 35–36.] Though their discussions continued, the parties dispute whether these discussions were about a *finalized* order or a *potential* order. [Dkt. 53, ¶ 40.]

In November 2022, Legan sent Petro Drimonas a message that "[w]e still have time. I can change this whole order to a Chinese import that matches Madix's Gondola. You won't even notice the difference," to which Petro responded "No, no, I don't want that. I want the German stuff." [Dkt. 51, ¶ 48; Dkt. 59, ¶ 87.] The parties met once more in December 2022 to discuss the final floor plan for the 87th Street store. [Dkt. 53, ¶ 47.]

In February 2023, Legan sent an email to Petro Drimonas asking "can we discuss some partial payment on the inventory?"; he repeated this request in March. [*Id.*, ¶ 51.] In April, Legan sent Petro Drimonas a text message stating "I just want to reconfirm that we are not meeting today. I had not heard back from you from last weeks email request so I filled the afternoon with other meetings. I will be in my office tomorrow, Friday, if we can touch base to see if I can just get the written approval from you on the 87th Street order. I can't start talking to AWG about invoice paperwork until I have something in writing from you." [Dkt. 51, ¶ 52.]

In the spring of 2023, James Dremonas and Petro Drimonas met with Legan to inform him that Pete's would not be paying for the shelves, and that Pete's had decided to work with Storeflex instead. [*Id.*, ¶ 54; Dkt. 53, ¶ 50.] According to Kesseböhmer, when Petro Drimonas informed Legan that Pete's had sought quotes from Storflex, Legan responded "[j]ust [a] reminder, Jimmy [Dremonas] approved the

3

quotes that prompted us to bring in all the equipment from Germany for the two New Stores – 87th and Orland Park. We have the inventory on hand only because Jimmy [Dremonas] gave us the go ahead to get stuff into stock by end of 2022. . . ." [Dkt. 53, ¶ 58.] Petro Drimonas did not respond. [*Id.*]

The parties dispute the degree to which Kesseböhmer modified the shelving for Pete's stores. [Dkt. 51, ¶¶ 56–57.] After the deal fell through, Kesseböhmer attempted to sell the shelves to other customers through AWG and it identified nine potential U.S. buyers [*Id.*, ¶¶ 63, 65–69.] It is undisputed that Kesseböhmer did not try to sell the shelving on an "individual part basis" and did not to attempt to sell the shelving to any European buyers. [*Id.*, ¶ 65.] In the fall of 2023, Kesseböhmer sold approximately $30,000 worth of the shelves to All American Beverage. [*Id.*, ¶¶ 72, 74.] The rest remains unsold.

## II.     Legal Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When reviewing cross-motions for summary judgment, all facts and reasonable inferences are construed in favor of the party "against whom the motion under review was made." *Frazier-Hill v. Chicago Transit Auth.*, 75 F.4th 797, 801 (7th Cir. 2023). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Birch|Rea Partners, Inc. v. Regent Bank*, 27 F.4th 1245, 1249 (7th Cir. 2022). The Court "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Johnson v. Rimmer*, 936 F.3d 695, 705 (7th Cir. 2019) (quoting *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003)). But defeating summary judgment requires evidence, not mere speculation. *See Weaver v. Champion Petfoods USA Inc.*, 3 F.4th 927, 934 (7th Cir. 2021).

### III. Analysis

#### A. Implied-in-Fact Contract

Pete's disputes whether a contract was ever formed between the parties. "To establish a breach of contract in Illinois, a plaintiff must prove: (1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) damages." *Gociman v. Loyola Univ. of Chicago*, 41 F.4th 873, 883 (7th Cir. 2022). Contracts in Illinois "can be either express or implied-in-fact." *Id.* Implied-in-fact contracts require the same elements as express contracts, but their "terms are inferred from the conduct of the parties." *Id.* An enforceable contract requires offer, acceptance, consideration, and mutual assent. *Nat'l Prod. Workers Union Ins. Tr. v. Cigna Corp.*, 665 F.3d 897, 901 (7th Cir. 2011); *Urban Sites of Chi., LLC v. Crown Castle USA*, 979 N.E.2d 480, 496 (Ill. App. Ct. 2012) ("In order for a contract to come into being there must be mutual assent between all of the parties.") The existence of mutual assent is determined based on the parties' "objective manifestation of intent" and not their "subjective understanding." *Urban Sites of Chi.*, 979 N.E.2d at 496.

In Illinois, whether an implied-in-fact contract exists is ordinarily a question of law, but the "existence of an implied contract [] depends on the facts, circumstances, and expressions by parties demonstrating an intent to be bound." *Trapani Constr. Co. v. Elliot Grp., Inc.*, 64 N.E.3d 132, 141 (Ill. App. Ct. 2016). "[W]hen there is a factual dispute, the existence of a contract is a question for the trier of fact to decide." *Quinlan v. Stouffe*, 823 N.E.2d 597, 602 (Ill. App. Ct. 2005); *see also Liautaud v. Liautaud*, 221 F.3d 981, 985 (7th Cir. 2000) (In Illinois, the existence of a contract is a question of law "when the basic facts are not in dispute"); *Baker v. Internap. Network Serv.*, 2010 WL 3834003, at *3 (N.D. Ill. Sept. 23, 2010).

Here, "facts are in dispute that are essential to determining whether the parties demonstrated an intent to be bound." *Trapani*, 64 N.E.3d at 142. Kesseböhmer maintains that the parties' objective conduct, including the continued meetings and conversations between Legan and Petro Drimonas, as well as the communications about production, tooling, engineering, customizing, shipping and even payment, all occurred without objection such that there was mutual assent. [Dkt. 42 at 9–14.] Pete's, on the other hand, argues that there was no intent to contract given that it communicated early on that store layouts and floorplans for the 87th Street store were not yet final. It also argues that Legan's repeated requests for written approval together with an alleged failure to inform Petro in October 2022 that Kesseböhmer had started production of the shelves means there could not

5

possibly be "an objective manifestation of acceptance to a contract" given the high dollar value of the shelving. [Dkt. 54 at 9; Dkt. 45 at 13–14.]

Whether the parties' communications, including their discussions regarding changes to the floorplans and to the shelving itself, objectively manifested mutual assent cannot be appropriately decided by the court at summary judgment. A reasonable jury could find that Petro Drimonas's conduct by at least December 2022, when the parties met to discuss a final floor plan for the 87th Street store, objectively demonstrated mutual assent. Recall that, before this meeting, Petro Drimonas was told that Kesseböhmer could "change this whole order" so that it "matches Madix's Gondola" without a perceptible difference; Petro responded by saying he wanted "the German stuff." [Dkt. 51, ¶ 48; Dkt. 59, ¶ 87.] Alternatively, a reasonable jury might find that Legan's discussions about needing signed approvals or an "official PO" evinced his awareness that there wasn't mutual assent. Who to believe is for the jury to decide.

Because the parties genuinely dispute the basic facts underlying whether they had an implied-in-fact contract, specifically whether their communications and conduct objectively manifested an intent to be bound, summary judgment as to Count One is denied.[3]

B.  Oral Contract

"Under Illinois law, oral agreements are enforceable 'so long as there is an offer, an acceptance, and a meeting of the minds as to the terms of the agreement.'" *Toll Processing Servs., LLC v. Kastalon Polyurethane Prods.*, 880 F.3d 820, 829 (7th Cir. 2018) (quoting *Bruzas v. Richardson*, 945 N.E.2d 1208, 1215 (Ill. App. Ct. 2011)). "[A]n oral agreement, like any other contract, 'must be sufficiently definite as to its material terms to be enforceable.'" *Yash Venture Holdings, LLC v. Moca Fin., Inc.*, 116 F.4th 651, 657 (7th Cir. 2024) (quoting *Toll Processing*, 880 F.3d at 829), *reh'g denied*, 2024 WL 4257157 (7th Cir. Sept. 20, 2024).

The existence of an oral contract, its terms, and the intent of the parties are questions of fact. *See Otto v. Variable Annuity Life Ins. Co.*, 134 F.3d 841, 848 (7th Cir. 1998) (citing Illinois cases). Those questions may become questions of law, however, "if the facts are undisputed and there can be no difference in the judgment of reasonable men as to the inferences to be drawn from them." *David Copperfield's*

---

[3] In light of Kesseböhmer's explanation as to its damages, the court disagrees with Pete's arguments that Kesseböhmer has failed to establish damages. [Dkt. 49 at 17–18.]

6

*Disappearing, Inc. v. Haddon Advertising Agency, Inc.*, 897 F.2d 288, 290 (7th Cir. 1990) (quoting *Ceres Ill. Inc. v. Ill. Scrap Processing, Inc.*, 500 N.E.2d 1, 4 (Ill. 1986)); *Roberts v. Alexandria Transportation, Inc.*, 968 F.3d 794, 799 (7th Cir. 2020) ("But the terms of an oral contract, along with whether it exists, its conditions, and the intent of the parties, are questions of fact for the jury to determine."), *certified question answered*, 183 N.E.3d 701 (Ill. 2021).

For example, questions of oral contract formation can be decided at summary judgment where the parties clearly intended for a written formal contract to follow their oral discussion and negotiation, which "is true *even if* the parties orally agreed to all of the terms of the contract, and no further negotiation is necessary." *Tindall Corp. v. Mondelez Int'l, Inc.*, 248 F.Supp.3d 895, 905 (N.D. Ill. 2017) (emphasis in original).

To determine whether the parties intended to reduce their agreement to writing, courts applying Illinois law consider the following factors: "whether the type of agreement involved is one usually put into writing, whether the agreement contains many or few details, whether the agreement involves a large or small amount of money, whether the agreement requires a formal writing for the full expression of the covenants, and whether the negotiations indicated that a formal written document was contemplated at the completion of the negotiations." *Quake Const., Inc. v. Am. Airlines, Inc.*, 565 N.E.2d 990, 994 (Ill. 1990) (citing *Ceres*, 500 N.E.2d at 5).

Only Pete's moves for summary judgment on this count, arguing that because price and timing were not established at the August 23, 2022 meeting, no enforceable oral contract was formed. [Dkt. 45 at 10–11.] According to Pete's, the parties' discussion about a "baseline price for going forward with 87th and Kedzie and Orland Park," combined with a handshake, is not enough to establish offer and acceptance. [*Id.*]

As Kesseböhmer argues, however, this is too narrow a view of the facts. [Dkt. 49 at 6–7.] Viewed in a light most favorable to Kesseböhmer, as the court must at summary judgment, there are genuine disputes about whether price and timing were established at the meeting. Klehm's deposition testimony, if believed, would establish that at the meeting, Petro Drimonas said "for 350 you have the deal," to which Klehm responded "let's make 375," and the two shook hands. Likewise, Legan testified that James Dremonas "agreed to the 375 and said, let's go forward, get the two stores here by the end of the year. [ ] Let's do it." [Dkt. 59, ¶ 71.] Of course, Klehm later sent Legan an email saying, "Pete's can still say, we didn't order…So everything we are

7

doing right now is based on trust…which is OK with me for this order." [Dkt. 51, ¶ 42.] This statement arguably undermines the argument that price and timing were adequately established at the August 23 meeting. Ultimately, what to make of these statements is for a jury to decide.

Pete's points to other factors tending to show that the parties intended for their agreement to be in writing before it became binding. This includes the sizable amount at issue ($850,000), and internal communications at Kesseböhmer indicating a desire for a formal write-up. [Dkt. 49 at 12.] Though these factors weigh in Pete's favor, the court cannot conclude that they "weight so heavily" that Pete's is entitled to summary judgment on this claim as a matter of law. *Tindall Corp*, 248 F.Supp.3d at 906. At summary judgment, contradictory evidence like what's at issue here must be viewed in Kesseböhmer's favor as the non-moving party. Though a jury might conclude that the parties' discussions were simply too indefinite on price and timing to be an enforceable oral contract, Kesseböhmer has come forward with admissible testimony that, if credited, would establish that by the end of the August 23 meeting, the parties had agreed on $375,000 for two stores by the end of the year.

In the end, the court cannot resolve the parties swearing contest at the summary judgment stage. *Payne*, 337 F.3d at 770 (courts "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder . . . the court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." (cleaned up) (quoting *Waldrige v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994)). Because genuine disputes of material fact remain regarding whether the parties formed an oral contract during the August 23 meeting, Pete's motion for summary judgment is denied.

### C. Affirmative Defenses

Both parties also move for summary judgment on Pete's statute of frauds affirmative defense, and Kesseböhmer moves for summary judgment on the failure to mitigate affirmative defense. The court addresses each in turn.

*Statute of Frauds*

Because genuine issues of fact remain on the implied-in-fact and oral contract claims, and because the statute of frauds applies only to contracts "valid in other respects," *see* 810 ILCS 5/2-201(3), a jury must first determine the threshold question of whether a contract was formed and whether there was a breach that resulted in damages. If a jury finds that Kesseböhmer has met its burden on either contract claim, then it would also need to decide whether the statute of frauds applies.

Illinois has codified the UCC's statute of frauds, which provides "a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties." 810 ILCS 5/2-201(1). A statute of frauds analysis can apply to either oral or implied-in-fact contracts. *Telebrands Corp. v. My Pillow, Inc.*, 2020 WL 291386, at *4 (N.D. Ill. Jan. 21, 2020). Kesseböhmer argues that two exceptions to the statute of frauds apply, making a writing unnecessary: the "specially manufactured" exception and "between merchants" exception.

The "between merchants" exception does not apply. "Between merchants" means "any transaction with respect to which both parties are chargeable with the knowledge or skill of merchants." 810 ILCS 5/2-104(3). "Merchant" is defined as "a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction." 810 ILCS 5/2-104(1). "A mere consumer of goods who does not resell the goods cannot be considered a merchant." *Forms World of Illinois, Inc. v. Magna Bank*, N.A., 779 N.E.2d 917, 921 (Ill. 2002). There is no dispute that Kesseböhmer is in the store fixtures business and "supplies shelving and other displays for retail businesses." [Dkt. 51, ¶ 1.] Pete's is a supermarket chain. [*Id.*, at ¶ 3.] Kesseböhmer argues that because Pete's "was an extremely knowledgeable and experienced buyer of the products at issue," it should be deemed a merchant. [Dkt. 55 at 9.] But a nearly identical argument was rejected in the case to which Kesseböhmer cites. *Vanguard Energy Servs. v. Shihadeh*, 82 N.E.3d 1284, 1287-1289 (Ill. App. Ct. 2017) (citing *Forms World*, 779 N.E.2d at 921)). This exception does not apply.

The "specially manufactured" exception raises disputes of fact that cannot be resolved by the court at summary judgment. A party seeking the specially manufactured exception must show that (1) the goods were specially manufactured for the buyer; (2) the seller cannot resell the goods to others in its normal course of business; and (3) the seller substantially started manufacturing the goods before the buyer repudiated. 810 ILCS 5/2-201(3)(a); *Vanguard Energy*, 82 N.E.3d at 1290.

9

Here, the parties dispute both whether the shelves were specially manufactured and Kesseböhmer's ability to resell them in its normal course of business, including as it relates to the sufficiency of its efforts to sell the shelves. [Dkt. 51, ¶¶ 57, 63–72.] If necessary, this will be a question for the fact finder to decide

*Failure to Mitigate*

Kesseböhmer also seeks summary judgment on Pete's affirmative defense for failure to mitigate. At an earlier stage in the litigation, the court provided Kesseböhmer an opportunity to amend its complaint to add additional allegations regarding inability to resell the shelves, which Kesseböhmer did. [Dkt. 19, ¶¶ 78-90.] According to Kesseböhmer, Pete's has introduced no evidence that Kesseböhmer's efforts were not reasonable or that it failed to exercise ordinary care to minimize damages, as is Pete's burden at summary judgment. [Dkt. 42 at 18; Dkt. 53, ¶ 64.] Pete's responds that it is disputed that Kesseböhmer "contacted many of the potential customers, as [Kesseböhmer] has not provided evidentiary support for such contention." [Dkt. 54 at 19.]

Pete's response on this score is weak. It responds to the factual assertion that Kesseböhmer undertook sufficient efforts to identify and sell the shelves to other potential purchasers by pointing to vague and incomplete deposition testimony from Ray Powers. [Dkt. 53, ¶ 64.] As Kesseböhmer argues, there is other testimony by Powers about the difficulties Kesseböhmer faced with selling to those customers given customer preferences and lack of immediate need. And Pete's has not come forward with evidence disputing Kesseböhmer's factual assertion that it did contact other potential buyers as evidence by emails, screenshots and social media posts. Still, weak arguments survive motions for summary judgment, so the sufficiency of Kesseböhmer's mitigation efforts is best explored through adversarial presentation at trial.

Summary judgment on both affirmative defenses is denied.

### IV. Conclusion

For the reasons stated above, both motions for summary judgment are denied in full.

Enter: 24 CV 1172
Date: August 8, 2025

Lindsay C. Jenkins